# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO.:17-00295-01 |
| V. | CHIEF JUDGE HICKS |
| PAUL ANDREW TALLEY | MAGISTRATE JUDGE HORNSBY |

## UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS EVIDENCE

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, who respectfully opposes the Defendant's Motion to Suppress for the following reasons:

## I.     Introductory Summary

The defendant, Paul Andrew Talley, is charged with four counts of Access with Intent to View Child Pornography in violation of 18 U.S.C. § 2252(a)(5)(B).  [Rec. Doc. 1].  The defendant filed a motion to suppress all evidence derived from Search and Seizure Warrant issued by a Magistrate Judge for the United States District Court for the Eastern District of Virginia. [Rec. Doc. 18].[1]   Talley states the warrant was illegal because the search violated Talley's Fourth Amendment Rights and the

---

[1] Talley filed Exhibits A and B with his motion and brief.  Exhibit A, which is Bates numbered NIT-001 through NIT-040 and is in the record as Rec. Doc. 18-1, is the Application for the Search Warrant authorizing the NIT from the Eastern District of Virginia dated February 20, 2015 and will be referenced as Def. Ex. A. The page numbers reference in this response are Bates number/record document and not the page number of the FBI Agents affidavit. Exhibit B, Rec. Doc. 18-2, is a case digest showing rulings on suppression motions from the Playpen from various United States District Courts and will be referenced as Def. Ex. B.

warrant was issued in violation of Rule 41(b) of the Federal Rules of Criminal Procedure. *Id.* Talley submitted an additional memorandum in support of his motion to suppress where he clarified the warrant was issued without jurisdiction and thus was void ab initio. [Rec. Doc. 18-3).

In late February and early March 2015, the FBI seized and, for approximately two weeks, assumed administrative control of "Playpen," a child pornography hidden-services website that had been operating for six months on the anonymizing Tor network.  During that period, and pursuant to a search warrant and Title III order authorized by two different federal judges, the FBI monitored the traffic on the website and deployed a network investigative technique (NIT) for the purpose of locating and prosecuting the website's users who were logged into, and actively accessing, the child pornography website.  As a result of the FBI's operation, the IP addresses of thousands of users who thought they could anonymously conceal their active participation in the sexual exploitation of children were identified, and many of the once-anonymous perpetrators have been located.  Based on the result of the NIT, the FBI office applied for and received a search warrant for an address where Talley was living with his mother and stepfather in Coushatta, Louisiana.  [Govt. Ex. 1 and 2].[2]

Talley contends that the search warrant that authorized the NIT is deficient in several respects.  He repeats several arguments that have been rejected by courts

---

[2] The application and search warrant are redacted, but unredacted versions are available in the record. The page numbers referenced in this response are the red page numbers at the bottom middle of each page.

**Government's Opposition to Motion to Suppress—Page 2**

nationwide. Talley's motion falls far short of establishing that suppression of his computer in this case is appropriate. Importantly, Talley fails to show that suppressing evidence in this case will have any deterrent effect on law enforcement and that the FBI's conduct should not be covered by the good-faith exception to the warrant requirement. In fact, Federal Rule of Criminal Procedure was amended effective December 1, 2016, to allow this type of search. Further, the two circuit courts and the overwhelming majority of district courts that have addressed this issue have found that suppression of evidence derived from the NIT is inappropriate. [Def. Exh. B]. Finally, no District Court in the Fifth Circuit has suppressed the NIT warrant. This Court should join the majority of courts that have rejected similar requests and deny Talley's motion.

## II.     Background

### A.     The anonymizing Tor network hosts "Playpen," a website dedicated to child pornography.

Talley's motion addresses the use of technology to locate users, like himself, of a "hidden-services" website called "Playpen." Playpen was the subject of a nationwide investigative effort to stop the proliferation of illegal child pornography facilitated by the Tor network. The Tor network is similar to the traditional Internet, with two relevant differences.

First, the Tor network allows users to anonymously browse the Internet. [Def. Ex. A at 10]. Generally speaking, if an individual browses, for example, CNN's website using a traditional web browser (like Internet Explorer), CNN can see that

individual's internet protocol address (IP address), which can be logged in CNN's server.  [Def. Ex. A at 11].[3]

The Tor network upends the traditional Internet-browsing model because it provides users anonymity by hiding from a website the true IP address of a computer accessing that website.  [Def. Ex. A at 016].  In other words, if a computer in Louisiana accesses CNN.com through the Tor network, CNN is no longer able to locate that computer through its true IP address.  [Def. Ex. A at 016]  The Tor network hides the true IP address by bouncing the communications around a distributed network of relay computers, also called "nodes," run by volunteers all around the world.  [Def. Ex. A at 016, Rec. Doc. 18-1].  As the communication bounces around the nodes, the various IP addresses of these nodes obscure the location from which a communication is traveling.  When the user's computer eventually accesses the website via this network of nodes, only the IP address of the last "exit" node (rather than the IP address from where the computer signal originated) appears in the website's log of IP addresses.  [Def. Ex. A at 016].

---

[3] An IP address is an identifying number that is assigned to devices that are connected to the Internet.  (*See* Def. Ex. A at 011-012.)  An IP address is assigned by an Internet service provider (ISP), and the IP address allows one computer to communicate with other devices across the Internet.  (*See id.*)  At any given time, only one modem connected to the Internet can have an IP address; so, an ISP can typically identify the location from where a computer or device engaged in a particular transaction on the Internet if the ISP knows the IP address used for the transaction and the date and time of the transaction.  (*Id.*)  For example, on the traditional Internet, if an individual went to a coffee shop, logged on to the coffee shop's Internet connection, and then made a purchase from a particular website ("Website A"), generally speaking, Website A could determine the IP address of the computer from where the purchase was made, which would return not to the computer, but instead to the coffee shop.

The Tor network is also different from the traditional Internet in that it allows, within the Tor network, for websites to be configured as "hidden-services" sites.  [Def. Ex. A at 016-017].  The IP address of a Tor hidden-services site is replaced with a Tor-based web address—a series of algorithm-generated characters followed by the suffix ".onion," a function of which makes it impossible to determine, through public lookups, the IP address of a computer hosting a Tor hidden-service site.  [Def. Ex. A at 016-017].  In order to get to the URL of a hidden-services site, that user must use Tor software and operate within the Tor network.  [Def. Ex. A at 017].  Moreover, a Tor user cannot search for a hidden-services site on a search engine like Google. [Def. Ex. A at 017]. Instead, generally, the user must know the exact ".onion" web address of the hidden-service site in order to access it. [Def. Ex. A at 017]. When an individual looks at a website on the Tor network, after the computer signal travels through random nodes and eventually makes contact with the website's server, a communication channel is established between the computer and the server, which allows the user to view and download what is on the website.  [Def. Ex. A at 029].  In the case of a computer on the Tor network accessing a hidden-services site, neither the computer nor the hidden-services site can see the other's IP address.  [Def. Ex. A at 017]. Instead, they are able to communicate through the communication channel set up by the Tor network.

Playpen—which was dedicated to child pornography—began operating as a hidden-services site in approximately August 2014.  [Def. Ex. A at 018].[4]  Generally

---

[4] In Defense Exhibit B, TARGET WEBSITE refers to Playpen.

speaking, Playpen required users to register with a username and password.  [Def. Ex. A at 019-020].  Upon entering the website, several forums were listed as a sort of "Table of Contents" and accessible to users, including forums and sub-forums for "Girls HC,"[5] "Incest," and "Toddlers."  [Def. Ex. A at 018-022].  Each forum and sub-forum contained topics, i.e., posts often including discussions, preview images, and image and/or video files (either linked within the Playpen website itself or linked to external websites) related to the particular forum topic involving the sexual abuse of children.  [Def. Ex. A at 020-021].

Because Playpen was running as a hidden-services site, the FBI was initially unable to track where the server was located or who was running the site, but through a chain of events originating from a foreign law enforcement agency's tip, the FBI was able to locate Playpen's server because the site was misconfigured.  [Def. Ex. A at 026-027].  The FBI used the rare opportunity to prepare and execute a sting operation that would allow the FBI to further locate, investigate, and prosecute suspects who were violating child pornography laws.

## B.    A federal judge issues a warrant authorizing a NIT to be deployed from the Eastern District of Virginia.

The Playpen server was copied and brought to a government facility in the Eastern District of Virginia.  [Def. Ex. A at 026-027].  On February 20, 2016, the FBI obtained a search warrant to deploy a network investigative technique (NIT) onto a government server to obtain information from "activating computers," i.e., "those of

---

[5] "HC" is shorthand for "hardcore," and refers to depictions of penetrative sexually explicit conduct.  (*See* Def. Ex. B at 16 ¶ 14 n.5.)

any user or administrator who logs into [Playpen] by entering a username and password." [6]   [Def. Ex. A at 004].  The warrant allowed the FBI to operate the NIT through the Playpen site for up to 30 days.  [Def. Ex. A at 003].  The NIT seized only six discrete pieces of identifying information from a computer that logged into the Playpen site—including the true IP address of the user and the computer's hostname. [Def. Ex. A at 005].

In support of the warrant application, the FBI submitted a 31-page affidavit describing Playpen and setting forth facts that established there was probable cause to believe that the six discrete pieces of information sought from computers who were logging into the Playpen site would be evidence of individuals violating federal child pornography laws.  [Def. Ex. A at 017-026]; *see also United States v. Froman*, 355 F.3d 882, 890 (5th Cir. 2004) (finding probable cause when affidavit established that defendant joined and maintained membership in a website dedicated to child pornography).

The warrant affidavit explained that Playpen was dedicated to child pornography and described the structure of the site.  Typical posts within the Playpen site appeared to contain text, images, previews of images, compressed files, and links to external sites.  [Def. Ex. A at 022].  The majority of the topics within the Playpen site contained discussions and images that appeared to be child pornography and child erotica of prepubescent children, including toddlers.  [Def. Ex. A at 022]  By way

---

[6] The FBI also obtained a Title III order authorizing the FBI to intercept private messages and private chats in real time on the Playpen website.  Talley's "realpirateguy666" username did not engage in private messages or chats during the period of time the FBI monitored communications pursuant to the Title III order.

of example, in the "Preteen Videos – Girls HC" forum, there existed a post containing four images of child pornography depicting a prepubescent girl, along with a hyperlink to a video of the same girl being anally penetrated by the penis of an adult male.  [Def. Ex. A at 023].  Another post in the website, accessed February 12, 2015, contained a link to a video file depicting an adult male ejaculating into the mouth of a prepubescent girl.  [Def. Ex. A 024-025].  The site also had a private messaging system that appeared to facilitate messaging related to the sexual exploitation of children.  [Def. Ex. A at 023].

The affidavit briefly described the opening page of the Playpen site.  [Def. Ex. A at 18].  This was an accurate description of how the Playpen site appeared during the course of the investigation.  The FBI later found out that, on February 19, 2015, the day before the NIT warrant was signed, the Playpen administrator had changed the image on this homepage to depict another sexualized depiction of one girl.

The warrant affidavit explained precisely what the NIT would do and how the NIT would help law enforcement locate Playpen's otherwise anonymous users.  [Def. Ex. A at 029-031].  Generally, whenever any computer accesses a website, that access is obtained by the computer's signal going to the website's server and then downloading content from the website's server to the computer to display a particular webpage.  [Def. Ex. A at 029-031].  Here, the NIT computer code used this process to find users' true IP addresses, which allowed law enforcement to identify users' physical locations that were otherwise hidden by the Tor network.  [Def. Ex. A at 031].

By logging into the Playpen website, a user's computer sent a signal to the server in Virginia.  The NIT was set up to function such that, once the user clicked on a post,[7] rather than receiving back from Playpen just the content of the post, the NIT used the communication stream between Playpen and the computer to send a string of code with computer instructions to the computer as it was downloading a Playpen post.  [Def. Ex. B at 029].  That string of code would cause the computer to transmit back to a government computer pieces of information, including the true IP address to which the computer was assigned by the ISP.  [Def. Ex. A at 029-030].

Between February 20, 2015, and March 4, 2015, (less than half the time authorized by the warrant and Title III order), the FBI assumed administrative control over, and monitored, the Playpen website.  [Govt. Ex. 1 at 013].  During this time, the NIT was installed onto, and operated from, a server in Virginia, which resulted in the FBI being able to track registered users' IP addresses when those registered users logged into Playpen and, generally speaking, clicked on a post. [Govt. Ex. 1 at 018-019].

The NIT did not search through any content from inside an activating computer; instead, the computer code only transmitted discrete pieces of information to the government server that were set forth in Attachment B to the warrant.  [Govt. Ex. 1 at 018-019).

---

[7] The manner by which the FBI set up the NIT to operate was more restricted than what the face of the warrant allowed.  The warrant allowed the FBI to set up the NIT to deploy once any user logged into the Playpen website.  (Def. Ex. A at 4-5.)  Generally speaking, for a user like Talley, the NIT was set up to deploy from Virginia only after the user logged into the Playpen website, navigated to a particular forum or sub-forum, and then actually clicked on a post.

**C.    User "realpirateguy666" creates a user account on Playpen, clicks through posts containing child pornography, and is caught by the NIT accessing Playpen from Talley's residence.**

On March 2, 2015, an individual created an account on the Playpen website with the username "realpirateguy666."  Between March 2 and March 5 2015, "realpirateguy666" was logged into Playpen with a user name and password for approximately three hours and forty-five minutes.  [Govt. Ex. 1 at 019].

During the FBI's Playpen sting, user "realpirateguy666" clicked through the Playpen site a number of times.  For example, on March 4, 2015, the user "realpirateguy666" accessed a post that contained a link to forty-nine images, most of which appeared to depict minor, prepubescent females nude below the waist. Several of the images appeared to depict an adult male using his erect penis to penetrate the anus of a prepubescent female. [Govt. Ex. 1 at 019].  Also on March 4, 2015, the user "realpirateguy666" accessed a post that contained a link to seven images, which appeared to depict a nude, female infant lying on her back. [Govt. Ex. 1 at 019]. One image appeared to depict an adult hand spreading the infant's vagina apart. [Govt. Ex. 1 at 019].  As the content of the Playpen posts were downloading onto his computer, the NIT was automatically sent from Virginia through the Tor nodes to "realpirateguy666'"s computer in Louisiana, utilizing the same communication stream as the Playpen webpage.  [*See* Def. Ex. A and Govt. Ex. 1].

One of those pieces of information was the actual IP address to which "realpirateguy666'"s computer was assigned at that specific time on March 4, 2015, as he accessed the child pornography post on Playpen.  [Govt. Ex. at 020].  The FBI

utilized a publicly available website to determine that BellSouth Telecommunications (BellSouth) was the ISP that assigned that particular IP address to an account accessing the Internet.   [Govt. Ex. at 020].   The FBI served BellSouth with an administrative subpoena for the identified IP address at the particular time user "realpirateguy666" clicked on the posts on Playpen.  [Govt. Ex. at 021].  The subpoena return reflected that the account had been receiving internet service at Talley's residence.[8]  [Govt. Ex. at 021].

**D.   The FBI executes a search warrant at Talley's residence, reviews his computer in his bedroom, and finds hundreds of images and videos of child pornography downloaded and saved onto Talley's computer.**

The FBI obtained from this District a search warrant to search the residence reflected in BellSouth subpoena return.  [Govt. Ex. 1 at 021].  The residential search warrant discussed the Playpen site and the NIT.  [Govt. Ex. 1 at 012-018].  The FBI recovered a computer from Talley's bedroom.  On that computer, the FBI found thumbnails of child pornography and search terms commonly used to find child pornography on the computer.  Talley was subsequently charged with access with intent to view child pornography for his activity on the Playpen site while the NIT was active. [Rec. Doc. 1].

**III.   Legal Standards**

Under the Fourth Amendment, "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be

---

[8] Talley lived in a room at the residence listed in the search warrant with his mother and stepfather.  Talley moved in with them after he was released from prison on January 7, 2015, for a Georgia conviction of Computer Aided Solicitation of a Minor.

searched, and the persons or things to be seized." U.S. Const. amend. IV.  "Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [his] constitutional rights." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

## IV.    Argument and Authorities

### A.    The NIT warrant complied with the Fourth Amendment.

Talley fails to show that the NIT warrant and February 2015 search violated the Fourth Amendment.[9]  "[T]he Fourth Amendment require[s] that (1) a warrant provide sufficient notice of what the agents may seize and (2) probable cause exist to justify listing those items as potential evidence subject to seizure." *United States v. Sanjar*, 853 F.3d 190, 200 (5th Cir. 2017); *see also Dalia v. United States*, 441 U.S. 238, 255 (1979).[10]

#### 1.    The NIT warrant was sufficiently particular.

The Fourth Amendment requires that a warrant "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Generic language may satisfy this 'particularity' requirement if describing a more specific item is not possible." *Sanjar*, 853 F.3d at 200. "The only relevant inquiry is

---

[9] The Fifth Circuit has held that an individual has no reasonable expectation of privacy in an IP address (which, by definition, is a number assigned by a third-party internet service provider). *See United States v. Weast*, 811 F.3d 743, 747 (5th Cir. 2016).

[10] Warrants must also be issued by a neutral, disinterested magistrate judge. *Dalia v. United States*, 441 U.S. 238, 255 (1979).  Talley does not challenge that the warrant was not issued by a neutral and disinterested magistrate judge.

whether, 'in light of the nature of the activity under investigation, and the manner of storing the information, [the warrant was] as particular as it could be.'" *United States v. Simpson*, 2011 WL 721912, at *4 (N.D. Tex. Mar. 2, 2011) (quoting *United States v. Logan*, 250 F.3d 350, 363 (6th Cir. 2001)) (alteration in original). "In reviewing challenges to particularly, [the court] read[s] the warrant as a whole, including its accompanying affidavits and attachments." *United States v. Aguirre*, 664 F.3d 606, 614 (5th Cir. 2011).

The NIT warrant does not lack particularity because it stated that the Playpen server in Virginia would be the place to be searched as such a reading of the warrant strains credulity, and the majority of courts nationwide that have addressed this argument have rejected it. *See, e.g., United States v. Hernandez-Cuellar*, 2017 WL 2297171, at *4 (E.D. Tex. May 26, 2017) (collecting cases).

The face of the warrant and warrant application plainly incorporate Attachment A, which makes clear that the NIT would be installed on a computer in the Eastern District of Virginia and would operate to receive information from activating computers, which is exactly what happened.[11]  Attachment A plainly states that the "place to be searched" authorizes a NIT to obtain information from an "activating computer," which is "any user or administrator who logs into the TARGET WEBSITE by entering a username and password." [Def. Ex. A at 037].  The warrant provided very specific details as to how this would occur:

> Under the NIT authorized by this warrant, the TARGET WEBSITE, which will be located in Newington, Virginia, in the Eastern District of

---

[11] The NIT collected only those discrete pieces of information authorized by Attachment B. (*See* Govt. Ex. 1)

> Virginia, would augment that content with additional computer instructions. When a user's computer successfully downloads those instructions from the TARGET WEBSITE, located in the Eastern District of Virginia, the instructions, which comprise the NIT, are designed to cause the user's "activating" computer to transmit certain information to a computer controlled by or known to the government.

[Def. Ex. A at 029]. The warrant continued, "this application requests authority for the NIT authorized by this warrant to attempt to cause the user's computer to send the above-described information to a computer controlled by or known to the government that is located in the Eastern District of Virginia." [Def. Ex. A at 031]. The level of detail in this warrant is sufficiently particularized under the requirements of a tracking warrant—it describes "the object into which [the tracker] is to be placed, the circumstances that led agents to wish to install the [tracker], and the length of time for which [tracking] is requested." *See United States v. Karo*, 468 U.S. 705, 718 (1984). Under the circumstances of the search, this information was sufficiently particular. *See United States v. Pawlak*, 237 F. Supp. 3d 460, 466-67 (N.D. Tex. 2017) (Fitzwater, J.) (rejecting argument that NIT warrant was general warrant); *United States v. Knowles*, 207 F. Supp. 3d 585, 602 (D.S.C. 2016) (finding this argument "tendentious" because "the point of the NIT search warrant was to learn the location of computers accessing Playpen").

### 2. The NIT warrant established probable cause that the search would uncover evidence of child pornography crimes and was not overbroad.

Under the Fourth Amendment, warrants must be based on sufficient probable cause. *See* U.S. Const. amend. IV. Additionally, "[t]he warrant must further not be overbroad, meaning 'there must be probable cause to seize the particular things

named in the warrant," a requirement that "flows from the probable cause requirement." *Sanjar*, 853 F.3d at 200.

"Probable cause does not require proof beyond a reasonable doubt, but only a showing of the probability of criminal activity." *Froman*, 355 F.3d at 889.  Moreover, "[a]n affidavit supporting a search warrant for child pornography does not need to show 'specific, individualized evidence of possession' of child pornography." *United States v. Gove*, 452 F. App'x 555, 557 (5th Cir. 2011) (quoting *United States v. Flanders*, 468 F.3d 269, 271 n.3 (5th Cir. 2006)).  Instead, "a court considering whether probable cause exists 'must make a practical, common-sense decision as to whether, given *all of the circumstances set forth in the affidavit* . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Gove*, 452 F. App'x at 557 (quoting *Froman*, 355 F.3d at 889) (emphasis added).

The Fifth Circuit has held that a search warrant affidavit establishes sufficient probable cause to search members of internet groups when the groups are exclusively dedicated to child pornography. (*Froman*, 355 F.3d at 889).  Playpen was solely dedicated to the proliferation and distribution of child pornography as shown in the 31-page search warrant affidavit for the NIT.  [Def. Ex. A].  *See e.g.*, *Hernandez-Cuellar*, 2017 WL 2297171, at *8 (collecting cases and quoting the observation that "Playpen's content, not its homepage, was the necessary factor in the probable cause determination").  The search warrant affidavit explains the steps a user would need to take to locate and register an account onto the Playpen site, states that "[t]he entirety of [Playpen] is dedicated to child pornography," describes images of child

pornography, and lists particularly forums and sub-forums within the site that "contain the most egregious examples of child pornography and/or dedicated to retellings of real world hands-on sexual abuse of children."  [Def. Ex. A at 017-026]. The warrant established probable cause to believe that the six discrete pieces of information set forth in Attachment B seized from computers logged into the Playpen site would be evidence of child pornography violations.  *See, e.g. United States v. Taylor*, 2017 WL 1437511, at *10 (N.D. Ala. Apr. 24, 2017) ("Like every other court to address this issue, the court finds that the NIT warrant was supported by sufficient probable cause.").

## B.   The NIT warrant was authorized by Rule 41 of the Federal Rules of Criminal Procedure.

Talley argues that the version of Rule 41 that was in effect at the time the search was conducted did not allow a magistrate judge to authorize the use of the NIT because the NIT—which found identifying information from computer users for the purpose of locating them—was not a tracking device.[12]  [Doc. 18-3 at 4].

While the technology authorized by the NIT warrant was somewhat novel, the magistrate judge in the Eastern District of Virginia had the authority to issue the warrant under the then-existing version of Federal Rule of Criminal Procedure 41(b)(4) and (a)(2)(E).  Rule 41(b)(4) states that "a magistrate judge with authority in

---

[12] Talley also argues that, because the NIT was not a tracking device, the magistrate judge in the Eastern District of Virginia violated 28 U.S.C. § 636(a).  This statutory provision does not include suppression as a remedy for violation.  As discussed *infra* Section IV.C.4, the application of the suppression doctrine to instances where the wrong magistrate judge signs a warrant does not remedy suppression's key goal:  to deter police officers from violating the Fourth Amendment.

the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both[.]" Fed. R. Crim. P. 41(b)(4). The rules define "property" to include "information." *Id.* at 41(a)(2)(A); *see also United States v. N.Y. Tel. Co.*, 434 U.S. 159, 169 (1977) ("Rule 41 is not limited to tangible items but is sufficiently flexible to include within its scope electronic intrusions authorized upon a finding of probable cause."). "Tracking device" is defined as "an electronic . . . device which permits the tracking of the movement of a person or object." *Id.* at 41(a)(2)(E); 18 U.S.C. § 3117(b). While the term "install" is not defined by the rules, the common definition of "install" is "to set up for use or service." *See* Merriam Webster Dictionary, "Install," *available at* http://www.merriam-webster.com/dictionary/install.

The then-current version of Rule 41(b)(4) permitted the NIT warrant's issuance. The "tracking device" here was the NIT itself. The NIT was used to track the movement of information both within and outside of Virginia after information from Talley's computer (his computer signal) moved through the Tor nodes and made contact with the Playpen website operating in Virginia. Once the "realpirateguy666" user clicked within the Playpen website, that computer opened up a communication stream between the government's server in Virginia and the computer in Louisana. The NIT, by way of operation, used that communication stream (i.e., a series of Tor nodes that connected back to Talley's computer) to track from where the computer signal emanated. It accomplished this by sending code through the communication

stream to the computer, and by causing the computer to relay the true IP address that the computer was assigned to at that moment.  Each of the discrete pieces of information relayed back to the FBI from the NIT—the IP address, the computer's name, etc.—provided the FBI information so it could track the location from where a Playpen user was accessing child pornography.

Rule 41 specifically defines "property" to include "information."  Fed. R. Crim. P. 41(a)(2)(A).  Talley is challenging this search and the NIT's execution because it seized information that he says belonged to him.  The NIT tracked this information, specifically, the signal from Talley's computer, and shot back limited pieces of information to help the FBI track from which computer in which judicial district a particular Playpen user was located.  Accordingly, because the NIT was the electronic equivalent of a tracking device to locate Talley's computer, it did not violate Rule 41. *See, e.g., United States v. Caswell*, 2017 WL 3600940, at *16 (M.D. Fla. July 11, 2017) (collecting cases and holding that Playpen NIT authorized under Rule 41(b)(4)); *United States v. Austin*, 230 F. Supp. 3d 828, 833 (M.D. Tenn. 2017) ("the NIT warrant did not violate Rule 41(b) because it is the computer equivalent of a 'tracking device'").

## C.  The good-faith exception to the exclusionary rule applies and renders suppression inappropriate.

Even if the Court is inclined to find that the NIT warrant was deficient, suppression is nonetheless inappropriate in this case because the good-faith exception to the exclusionary rule applies to the FBI's execution of the NIT onto Talley's computer.  *See, e.g.*, *United States v. Wheeler*, 2017 WL 3589564, at *2 (N.D.

Ga. Aug. 21, 2017) (in more than fifty decisions addressing suppression of the Playpen NIT warrant evidence, suppression has been denied in the "overwhelming majority" of cases).   Even where the Fourth Amendment has been violated, that "does not necessarily mean that the exclusionary rule applies."  *Herring v. United States*, 55 U.S. 135, 140 (2009).  Where, as here, agents execute a search pursuant to a warrant, the exclusionary rule does not apply so long as the police conducted the search in an "objectively reasonable reliance" on the warrant.  *United States v. Leon*, 468 U.S. 897, 922 (1984).  "The error in such case rests with the issuing magistrate, not the [agent], and 'punishing the errors of judges' is not the office of the exclusionary rule."  *Davis v. United States*, 564 U.S. 229, 239 (2009) (quoting *Leon*, 468 U.S. at 916) (alterations omitted); *see also Herring*, 555 U.S. at 142.  The Supreme Court has been "cautious against expanding" the exclusionary rule, and it only applies "where its remedial objectives are thought most efficaciously served."  *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (citations and alterations omitted); *see also United States v. German*, 486 F.3d 849, 854 n.7 (5th Cir. 2007).

"Normally, the issuance of a warrant by a magistrate suffices to establish an officer's good faith."  *United States v. Elrod*, 2015 WL 5227831, at *4 (N.D. Tex. Sept. 8, 2015) (citing *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012)). "In considering whether the good-faith exception applies, [the court does] not attempt an 'expedition into the minds of police officers' to determine their subjective belief regarding the validity of the warrant."  *United States v. Payne*, 341 F.3d 393, 400 (5th Cir. 2003) (quoting *Leon*, 468 U.S. at 922 n.23).  Instead, the injury is "confined to the

objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," and inquiry that "will ordinarily depend on an examination of the affidavit by the reviewing court." *Payne*, 341 F.3d at 400 (quoting *Leon*, 468 U.S. at 922 n.23 and *United States v. Gant*, 759 F.2d 484, 487-88 (5th Cir. 1985)); *Herring*, 555 U.S. at 701 (suppression only appropriate if "the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment").

Several factors highlight the FBI's reasonable reliance on the warrant at issue here.  First, as discussed above, the application and analysis of why the NIT technology is a tracking device is complicated.  Just as the decisions of the district judges who have determined that the then-applicable version of Rule 41 permitted the NIT search are not objectively unreasonable interpretations of law, it is not objectively unreasonable that the FBI did not anticipate the conflicting opinions of what it means to "install" a "tracking device" in the context of computer code that thwarts the anonymity of criminals using the Tor network.  *Accord United States v. Schuster*, 2017 WL 1154088, at *7 (S.D. Ohio Mar. 28, 2017) ("the sheer number of agents who have relied upon the NIT warrant, and obtained subsequent warrants from magistrate judges in their own jurisdictions, as well as the inconsistent rulings by district courts around the country, shows that no aspect of the NIT warrant's validity constitutes a simple question nor a close call").

Second, several courts have recognized that under the circumstances of this investigation, deployment of the NIT would have been justified even *without* a warrant due to exigent circumstances or a lack of a privacy interest arising from the Fourth Amendment that would arguably make the NIT a "search." *See, e.g. United States v. Matish*, 193 F. Supp. 3d 585, 613-14 (E.D. Va. 2016) (finding that the government did not need a warrant before deploying the NIT); *United States v. Johnson*, 2016 WL 6136586, at *4 (W.D. Mo. Oct. 20, 2016) (collecting cases and concluding "it is likely a warrant was not even constitutionally necessary to discover Defendant's IP address"); *United States v. Smith*, No. 4:15-CR-467, Opinion & Order at 8 (S.D. Tex. Sept. 28, 2016) (exigent circumstances justified the search).  Rather than using these arguments to defend a warrantless operation, the FBI sought judicial approval of the search by providing a 31-page affidavit to a federal judge, who, like many other judges, reasonably agreed that the NIT search was permitted under Rule 41.  *Accord United States v. Kelley*, 140 F.3d 596, 603 (5th Cir. 1998) ("we refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he was requested") (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984)).

Third, three years prior to this investigation, law enforcement sought and obtained a Rule 41 warrant to undertake a similar search using a NIT.  *See United States v. Laurita*, 2016 WL 4179365, at *3 (D. Neb. Aug. 5, 2016).  None of the defendants in that case raised this issue (a challenge they have now made and lost)

until *after* defendants challenged it in the Playpen cases.  *See id.* at *6 (denying suppression of NIT warrant search involving similar investigation because warrant authorized by Rule 41(b)(4)).

Notwithstanding the above, Talley contends that the good-faith exception does not apply for several reasons.  [*See* Rec. Doc. 18 and 18-3.]  Talley's arguments are wrong, and because suppression in this case would not deter constitutional misconduct, his requested suppression should be denied.

### 1. Talley has not shown that the exceptions to the good-faith doctrine apply in this case.

The good-faith exception does not apply if one of four circumstances are present:

> (1) if the issuing magistrate/judge was misled by information in an affidavit that the affiant knew was false or would have known except for reckless disregard of the truth; (2) where the issuing magistrate/judge wholly abandoned his or her judicial role; (3) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

*Payne*, 341 F.3d at 399-400.  Talley argues that the FBI agent and Magistrate Judge did not act in good faith as they should have known the warrant violated Rule 41(b) and 28 U.S.C. § 636(a).  [Rec. Doc. 18-3 at 6].  Neither assertion is warranted.

### a. The NIT warrant was not based on an affidavit lacking in indicia of probable cause.

"In the Fifth Circuit, this exception has been succinctly stated in terms of whether the affidavit was 'bare bones.'"  *Elrod*, 2015 WL 5227831, at *5 (collecting

Fifth Circuit cases).  There can be no question that the 31-page affidavit supporting the NIT warrant was not bare bones.  *Accord United States v. Broy*, 209 F. Supp. 3d 1045, 1058 (C.D. Ill. 2016) ("the government's efforts in establishing probable cause [for the Playpen NIT warrant] and obtaining the NIT warrant were unusually detailed and specific").

There can be no question that the FBI was justified in relying on the magistrate judge's probable cause determination given the host of federal judges who have determined that there was sufficient probable cause in the affidavit.  *See supra* Section IV.A.2; *accord Leon*, 468 U.S. at 926 (various opinions of a divided circuit panel "make clear" that the officers "provided evidence sufficient to crate disagreement among thoughtful and competent judges as to the existence of probable cause. Under these circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable.").

### b.   The magistrate judge was not mislead by information in the affidavit that the affiant knew was false.

"To bar application of the good-faith exception based on an affiant's intentional falsity or reckless disregard for the truth, a defendant must establish the falsity or reckless disregard by a preponderance of the evidence."  *United States v. Newton*, 2010 WL 1460052, at *8 (N.D. Tex. Apr. 13, 2010) (citing *United States v. Cavaros*, 288 F.3d 706, 710 (5th Cir. 2002)).  In that event, the court is to look at the remaining portions of the search warrant affidavit and "if the affidavit would have sufficiently provided probable cause without the false information, the warrant did not violate the Fourth Amendment and the evidence should not [be] excluded."  *Cavazos*, 288

F.3d at 710.

Talley does not even argue that the NIT search warrant affiant recklessly disregarded the truth or that the affidavit would not contain sufficient probable cause had the information he complains about not been included in the affidavit.  In fact, the result of all the warrants in the case show Playpen was involved in the proliferation and distribution of child pornography.

### 2.    Talley has not shown that this Court should ignore the good-faith doctrine when a warrant is *ab initio*.

Talley argues that the NIT warrant was void *ab initio* because of an alleged Rule 41 violation, and the good faith exception should not apply [Rec. Doc. 18-3 at 4-6].  Talley's position is contrary to Fifth Circuit law.  This Circuit has been presented with cases where a warrant was plainly, on its face, in violation of Rule 41, but nonetheless has applied the good-faith exception.  *See Kelley*, 140 F.3d at 604 (refusing to find per se suppression when warrant is unsigned and undated); *United States v. Richardson*, 943 F.2d 547 (5th Cir. 1991) (reversing suppression and applying good-faith exception where magistrate judge never administered the oath, rendering the warrant "constitutionally infirm").  Talley does not address either of these authorities.

The 10th Circuit has evaluated his *ab initio* argument in the context of this *exact same* Playpen NIT warrant and has rejected it.  In *United States v. Workman*, 863 F.3d 1313 (10th Cir. 2017), the Tenth Circuit reversed a district court's ruling to suppress evidence from the Playpen NIT warrant and specifically considered the argument that Talley urges here.  The Tenth Circuit held that, under the Supreme

Court's opinions in *Herring*, 55 U.S. at 135 and *Arizona v. Evans*, 514 U.S. 1 (1995), the good-faith exception applied to the FBI's conduct with the NIT warrant even assuming it was void at the outset. *See Workman*, 863 F.3d at 1318. Consistent with the Fifth Circuit's approach and the Supreme Court's admonishment against expanding the scope of the exclusionary rule, this Court should find that the good-faith exception is fatal to Talley's requested relief. *Accord Pawlak*, 237 F. Supp. 3d at 469 (rejecting argument); *United States v. Perdue*, 237 F. Supp. 3d 471, 447 (N.D. Tex. 2017) (Fitzwater, J.) (same).

### 3. Talley has not shown that a technical violation warrants suppression.

Even if the NIT warrant "technically" violated Rule 41, suppression is inappropriate. The Fifth Circuit has previously applied a "less stringent standard" for technical violations of Rule 41. *See United States v. Comstock*, 805 F.2d 1194, 1207 (5th Cir. 1986). Under circumstances involving certain warrant defects, the Fifth Circuit has said that suppression was warranted where (1) the defendant showed that he suffered legal prejudice, that is, that the search would not have occurred or been as abrasive or intrusive had Rule 41 been followed, or (2) where the officers violated the rule knowingly, intentionally, or with reckless disregard or conscious indifference. *See id.* (violation of "state court of record" requirement under Rule 41(a)); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981) (violation of Rule 41(d)).

After the Supreme Court's decision in *Leon*, this "less stringent standard" still requires the court to balance "the costs and benefits of suppressing this highly

reliable physical evidence," with the need for deterrence, a balance that "weighs much less heavily [when] the violation is neither of constitutional dimensions nor intentional." *Comstock*, 805 F.2d at 1207, 1210. In any event, "the policies behind the exclusionary rule are not absolute and must be evaluated realistically and pragmatically on a case-by-case basis." *Kelley*, 140 F.3d at 603 (quoting *United States v. Luk*, 859 F.2d 667, 671 (9th Cir. 1988)).

The Seventh Circuit has recognized that, "violations of the federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause and with advance judicial approval," because "[t]he remedy of allowing a defendant to go free based on a violation of Rule 41's requirements for obtaining a proper search warrant would be 'wildly out of proportion to the wrong.'" *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) (internal citation omitted). While in a different context, the Fifth Circuit has stated that while not entirely clear, the concept that "the suppression remedy is available for constitutional violations only" is "generally supported by case law." *German*, 486 F.3d at 854 (declining to hold whether a statutory violation could ever justify exclusion but declining to apply exclusionary rule because suppression not provided by statute); *see also United States v. Kingston*, 801 F.2d 733, 737 n.1 (5th Cir. 1986) ("The Supreme Court has expressly rejected the idea that 'a federal court should use its supervisory power to suppress evidence tainted by [even] gross illegalities that did not infringe defendant's constitutional rights.'" (quoting *United States v. Payner*, 447 U.S. 727 (1980)). For the reasons set forth in this brief, the balancing test here does not weigh in favor of suppressing

Talley's computer.  To the extent *Comstock* still applies to allow suppression for a rules violation that does not implicate the constitution, it is not satisfied here.

### a.   Talley was not prejudiced by the NIT warrant.

Talley was not prejudiced by the purported Rule 41 violation because, but for the violation, the June 24, 2015, search of his residence would have occurred anyway. But it does not follow that had the then-current version of Rule 41 prohibited a magistrate judge from authorizing the search, the search (which led to Talley's later residential search) would not have occurred.  As several courts have found, even if magistrate judges were not authorized under Rule 41 to issue the warrant, a *district* judge could have properly issued the warrant and authorized this search.  *See, e.g., Pawlak*, 237 F. Supp. 3d at 469 (finding no prejudice because "had a district judge been presented with the same warrant application, the district judge would have been authorized to issue a warrant for the search of [defendant's] computer in Texas"); *United States v. Jean*, 207 F. Supp. 3d 920, 936 n.16, 943 (W.D. Ark. 2016); *Broy*, 209 F. Supp. 3d at 1059; *accord United States v. Williams*, 617 F.2d 1063, 1099 (5th Cir. 1980) (Roney, J., concurring) ("I do not view the procedural provisions of the Federal Rules of Criminal Procedure as limiting the inherent powers of the United States courts to issue warrants." (quoting *N.Y. Tel. Co.*, 434 U.S. at 168 n.14)).  That a district judge in the Eastern District of Virginia issued a Title III order suggests further that the search would have occurred.

The FBI here monitored Playpen's user activity and developed probable cause to believe that individuals accessing posts on the website—including Talley—were

violating federal child pornography laws.  And they were right.  They received a magistrate judge's authorization to execute the search in the district where the search computer program was installed and operated, which resulted in Talley's computer disclosing an IP address in which Talley had no privacy interest.  Granting complete access to search through the contents of a computer (which is far more intrusive than what the NIT did here) is something that courts across the nation routinely authorize under circumstances where, as here, there is probable cause to believe that the computer is being used to access and download child pornography.  *See, e.g.*, *Froman*, 355 F.3d at 890.  Under the circumstances, Talley's right to be free from intrusion was not violated; he has not been prejudiced.

### b.      Talley has not established any bad faith by the FBI or the Magistrate Judge.

Talley makes several allegations of bad faith including "the FBI Agent and magistrate judge intentionally disregarded the law." Rec. Doc. 18-3 at 6.  Talley's allegations are meritless and do not warrant suppression. Indeed, in 2012, the FBI received Court authorization to conduct a very similar operation involving a NIT in connection with a site called PedoBook, which has since been determined to be within the scope of the then-current version of Rule 41.  *See Laurita*, 2016 WL 4179365, at *3.  To suggest that there was bad faith on behalf of the FBI and magistrate judge in a situation where federal judges have found that the conduct at issue was expressly permitted by Rule 41 is illogical.  *Accord Pawlak*, 237 F. Supp. 3d at 470 (finding that "the government did not intentionally violate the Rule" because "it was far from clear at the time that the NIT Warrant violated Rule 41(b)"); *Schuster*, 2017 WL 1154088,

at *7 ("The Court finds it entirely unreasonable to hold agents to such a standard of knowledge.  Indeed, if *anyone* should have been charged with such specific legal knowledge, it would have been the magistrate judges, not the agents.").

### 4. Suppressing the computer seized from Talley's residence would not deter Fourth Amendment violations.

Even assuming for purposes of argument that the NIT warrant implicated a constitutional, *ab initio*, or technical violation, suppression is nonetheless inappropriate here because Talley wholly fails to show how suppression of Talley's computer would achieve the only goal underlying the exclusionary rule:  deterrence of the police violating the Fourth Amendment.  The exclusionary rule is a "prudential doctrine" created by the Supreme Court "to compel respect for the constitutional guaranty."  *Davis*, 564 U.S. at 236 (citations omitted).  It is "'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search."  *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)).  Instead, it applies "only where it 'results in appreciable deterrence,'" of future Fourth Amendment violations.  *Herring*, 555 U.S. at 141 (quoting *Leon*, 468 U.S. at 909) (alterations omitted).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring*, 555 U.S. at 144.

Talley makes no showing that suppression in this case would deter police misconduct in a way that would contribute to protecting the Fourth Amendment.  Here, the IP address that was assigned to Talley's computer by an internet service

provider while Talley was looking for child pornography led to a residential search warrant and recovery of Talley's computer containing child pornography files. Suppression of this extremely reliable evidence is not appropriate here, where Talley has not articulated how such decision will deter the police, much less will deter police from violating the Fourth Amendment.

Moreover, Talley does not explain what needs to be deterred. Here, "[b]ecause Rule 41 has been updated to authorize warrants exactly like this one, there is no need to deter law enforcement from seeking similar warrants," and exclusion of evidence "would serve little deterrent purpose where the mistaken conduct of the magistrate judge, not the officers, invalidated the warrant." *Wheeler*, 2017 WL 3589564 (N.D. Ga. Aug. 21, 2017).[13]

The FBI undertook significant efforts to comply with the Fourth Amendment and provided detailed facts to a federal judge establishing probable cause and explaining the manner by which the search would be executed. Local FBI agents in this District presented warrants to search the residences of individuals like Talley, which were signed by magistrate judges in this District. As a result, Talley's computer with which he was illegally accessing child pornography received code that (unbeknownst to him) sent back, in less than a second, an IP address. As the Fifth Circuit has recognized, "law enforcement tactics must be allowed to advance with

---

[13] In December 2016, Federal rule of Criminal Procedure 41(b)(6) went into effect: a magistrate judge with authority in any district where activities related to a crime may have occurred has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within or outside that district if: (A) the district where the media or information is located has been concealed through technological means. Fed. R. Crim. P. 41(b)(6)

technological changes, in order to prevent criminals from circumventing the justice system." *In re U.S. for Historical Cell Site Data*, 724 F.3d 600, 614 (5th Cir. 2013) (quoting *United States v. Skinner*, 690 F.3d 772, 778 (6th Cir. 2012)).  The FBI's process here should be encouraged, not deterred.

In reality, granting Talley's relief will have no effect on protecting Fourth Amendment rights but comes with considerable costs.  Talley will be provided with a free pass for the child pornography he accessed on playpen and on his computer. When police officers in this district are faced with a complicated technological means of investigation to find anonymous cyber criminals, suppression in this case sends the message that the police should avoid trying to get court approval, and instead should move quickly and rely on the exigent circumstances surrounding their investigations. It is no surprise that the majority of courts balancing these costs—including both Courts of Appeals that have considered the issue—have determined suppression under these circumstances to be inappropriate.  *See e.g., United States v. Horton*, 863 F.3d 1041 (8th Cir. 2017) (reversing suppression and holding that good-faith exception applied to Playpen NIT warrant); *Workman*, 863 F.3d at 1320 (same); *Pawlak*, 237 F. Supp. 3d at 470 (denying suppression and concluding "as has nearly every other court to consider this question, that the good-faith exception applies to the execution of the NIT Warrant").

**V.**     **Conclusion**

For the aforementioned reasons, the United States respectfully requests that

Talley's motion to suppress be denied.

Respectfully submitted,

ALEXANDER C. VAN HOOK
United States Attorney

/s/ F. Michael O'Mara
F.MICHAEL O'MARA (SC. Bar No. 75338)
Assistant United States Attorney
300 Fannin Street, Suite 3201
Shreveport, Louisiana 71101
(318) 676-3600
(318) 676-3663 (fax)
Michael.omara@usdoj.gov

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO.:17-00295-01

V.                                CHIEF JUDGE HICKS

PAUL ANDREW TALLEY                MAGISTRATE JUDGE HORNSBY


## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2018, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to counsel for the defendants by operation of the court's electronic filing system.

/s/ F. Michael O'Mara
F.MICHAEL O'MARA (SC. Bar No. 75338)
Assistant United States Attorney
300 Fannin Street, Suite 3201
Shreveport, Louisiana 71101
(318) 676-3600
(318) 676-3663 (fax)
Michael.omara@usdoj.gov